FILED

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

2020 FEB 19  PM 3: 14

CLERK US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

**UNITED STATES OF AMERICA**

**v.**

**JOSE ISMAEL IRIZARRY, and
NATHALIA GOMEZ-IRIZARRY**

CASE NO. 8: 2020 cr 77 T 36 Tgw

18 U.S.C. § 1956
18 U.S.C. § 1343
18 U.S.C. § 1344
18 U.S.C. § 1346
18 U.S.C. § 1349
18 U.S.C. § 1028A
18 U.S.C. § 371
18 U.S.C. § 2
18 U.S.C. §§ 981-982

SEALED

## INDICTMENT

The Grand Jury charges that at all relevant times:

## COUNT ONE
**(Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))**

Background

1.     The mission of the Drug Enforcement Administration ("DEA")

is to enforce the controlled substances laws and regulations of the United

States. The DEA's primary responsibilities include, among other things,

   a.   Investigation and preparation for the prosecution of major violators

   of controlled substance laws operating at interstate and international

   levels; as well as,

   b.   Seizure and forfeiture of assets derived from, traceable to, or

SEALED

intended to be used for illicit drug trafficking.

2.      In pursuit of these responsibilities, the DEA at times employs various law enforcement techniques to investigate illegal drug traffickers and the professional money launderers who transport their illegal proceeds. One such technique is for DEA special agents or task force officers to pose in an undercover capacity as drug dealers or money launderers in order to identify real criminals and their methods. DEA may also pursue these investigations through the use of undercover corporate identities, undercover bank accounts, and confidential informants. In certain circumstances, the DEA might conduct undercover financial transactions with associates of an illegal drug trafficking organization.

3.      Cocaine is a controlled substance derived from coca leaves grown primarily in the northwest Andean region of South America. Cocaine is typically smuggled into the U.S. by organized criminal gangs based outside of the United States. Proceeds of illegal cocaine distribution in the U.S. are generally laundered back to source countries or other nations where the criminal organizations are based.

4.      Colombia is a significant source of the world's cocaine production, including an estimated majority of cocaine smuggled into the United States. With the consent and support of the Government of Colombia,

the DEA has personnel stationed in Colombia, including investigators at DEA offices in Bogota and Cartagena.

<u>The Defendants</u>

5. Defendant JOSE ISMAEL IRIZARRY ("IRIZARRY") was a special agent with the DEA from approximately August of 2009 until approximately January of 2018. IRIZARRY was assigned to the Miami Field Division from the time he was hired until approximately February of 2015, when he was transferred to Cartagena, Colombia. In approximately October of 2017, IRIZARRY was reassigned to the Washington, D.C. area, where he worked until his resignation from the DEA in approximately January of 2018. Throughout his tenure at DEA, IRIZARRY engaged in a corrupt scheme in which he worked with confidential informants to investigate the money laundering activity of drug trafficking organizations, while at the same time enriching himself by secretly using his position and his special access to information to divert drug proceeds from DEA control to the control of himself and his co-conspirators.

6. On or about December 31, 2010, IRIZARRY petitioned for personal bankruptcy in the United States Bankruptcy Court in Ft. Lauderdale, Florida (the "Bankruptcy Court"). During the ordinary course of the Bankruptcy Court proceedings, IRIZARRY made a series of sworn statements

regarding his income, his assets, and his ability to repay debtors. None of these sworn statements included the amount of funds obtained by IRIZARRY as part of the corrupt scheme described in this Indictment. On or about March 3, 2016, the Honorable John K. Olson ordered IRIZARRY's debts discharged and ended the bankruptcy proceedings. IRIZARRY never reported any funds obtained from the corrupt scheme described in this Indictment.

7.     Defendant NATHALIA GOMEZ-IRIZARRY ("GOMEZ") is IRIZARRY's wife. She was formerly known as Nathalia Gomez Ramirez. From approximately July of 2013 until approximately September of 2014, GOMEZ managed a Florida corporation known to the Grand Jury and identified herein as Company 1. During its single year of existence, GOMEZ represented in filings that Company 1 was an export business that GOMEZ operated out of IRIZARRY and GOMEZ's home in Miramar, Florida, although Company 1 hired no employees and failed to sell any goods. Instead, GOMEZ utilized Company 1 as a shell company to receive and distribute funds involved in the corrupt scheme described in this Indictment. IRIZARRY and GOMEZ further used Company 1 as a vehicle for concealing IRIZARRY's involvement in the financial transactions described in this Indictment.

### Unindicted Co-conspirators

8.      Unindicted CO-CONSPIRATOR 1 is a Colombian citizen residing in Colombia who conducted financial transactions in the United States throughout the conspiracy period, including from a fraudulent bank account opened with a stolen identity known as Criminal Account-1. As early as 2011, CO-CONSPIRATOR 1 was identified by the DEA, including in reports written by IRIZARRY, as the leader of a Colombia-based drug trafficking and money laundering organization (the "CO-CONSPIRATOR 1 criminal organization"). In approximately 2015, CO-CONSPIRATOR 1 became the godfather to IRIZARRY and GOMEZ's children.

9.      Unindicted CO-CONSPIRATOR 2 is a Colombian citizen residing in Colombia who conducted financial transactions in the United States throughout the conspiracy period, including from the aforementioned bank account opened with a stolen identity. CO-CONSPIRATOR 2 is an associate of CO-CONSPIRATOR 1 and conducted financial transactions with GOMEZ. At all times relevant to this Indictment, CO-CONSPIRATOR 2 was employed as a public official in Colombia.

### The Money Laundering Conspiracy

10.     Beginning on a date unknown to the Grand Jury, but no later than in or about February of 2011, and continuing through a date unknown to

5

the Grand Jury, but no earlier than in or about January of 2018, in the Middle

District of Florida, the Southern District of Florida, the Republic of Colombia,

and elsewhere, the defendants,

JOSE ISMAEL IRIZARRY, and
NATHALIA GOMEZ-IRIZARRY,

did conspire with each another, as well as other persons, both known and

unknown to the Grand Jury, to commit offenses in violation of 18 U.S.C. §

1956(a)(1), that is,

> knowing that the property involved in a financial transaction represented
>
> the proceeds of some form of unlawful activity, conducted and attempted
>
> to conduct such a financial transaction which in fact involved the proceeds
>
> of specified unlawful activities,
>
> > (A)(i) with the intent to promote the carrying on of a specified
> >
> > unlawful activity, and
> >
> > (B) knowing that the transaction is designed in whole and in part (i)
> >
> > to conceal and disguise the nature, the location, the source, the
> >
> > ownership, and the control of the proceeds of specified unlawful
> >
> > activity; and (ii) to avoid a transaction reporting requirement under
> >
> > State and Federal law; and

to commit offenses in violation of 18 U.S.C. § 1957, that is, knowingly

engaged and attempted to engage in a monetary transaction in criminally

6

derived property of a value greater than $10,000 and is derived from specified unlawful activity; all in violation of 18 U.S.C. § 1956(h).

11.    It is further alleged that the specified unlawful activity in the foregoing paragraph included the unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), as well as an offense against a foreign nation involving the manufacture, importation, sale, and distribution of a controlled substance; the perpetration of various frauds, in violation of 18 U.S.C. §§ 1343, 1344, and 1349; the commission of identity theft, in violation of 18 U.S.C. § 1028; and the theft and embezzlement of government property, in violation of 18 U.S.C. § 641.

### Objects of the Conspiracy

12.    The objects of the conspiracy were to conduct prohibited monetary and financial transactions; to enrich the conspirators and their family and friends; to support the CO-CONSPIRATOR 1 criminal organization; and to hide assets, income, and financial activity from government authorities in the United States and Colombia.

### Manner and Means of the Conspiracy

The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

13.    It was a part of the conspiracy that on a date uncertain to the

7

Grand Jury, but no later than November 30, 2011, investigators based in the DEA Miami Field Division, including IRIZARRY, began an investigation into the drug trafficking and money laundering activities of CO-CONSPIRATOR 1 using various law enforcement techniques, including posing undercover as money launderers and utilizing confidential informants.

14.    It was further part of the conspiracy that IRIZARRY, GOMEZ, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury, used the cover of the CO-CONSPIRATOR 1 investigation, as well as the cover of other DEA investigations, to secretly divert drug proceeds from government control to their own personal control without government authorization. Central to the scheme was IRIZARRY omitting, falsely reporting, and mischaracterizing key information to other DEA agents and supervisors regarding the movement of drug proceeds being investigated. IRIZARRY's actions enabled IRIZARRY, GOMEZ, CO-CONSPIRATOR 1, and CO-CONSPIRATOR 2 to use the diverted drug proceeds to purchase jewelry, luxury vehicles, a home, and to make cash gifts to friends and family.

15.    It was further part of the conspiracy that IRIZARRY, GOMEZ, CO-CONSPIRATOR 1, CO-CONSPIRATOR 2, and others known and unknown to the Grand Jury, took steps to hide the true nature of, and to

8

conceal their participation in, certain financial transactions in the U.S. and Colombia that otherwise could be traceable to their unlawful activity, including drug distribution. For example, the defendants at times utilized Criminal Account-1 to receive diverted drug proceeds and to subsequently spend them or transfer them to friends, family, and business associates.

### Actions to Facilitate the Money Laundering Conspiracy

It was further part of the conspiracy that the following facilitating actions were taken by the conspirators:

*Witness 1 pays IRIZARRY and GOMEZ to divert DEA funds*

16.    On or about the following dates, an individual known to the Grand Jury and identified herein as Witness 1, assisted IRIZARRY and the DEA to pick up the following sums of drug proceeds in an undercover capacity:

|      | Approximate date | Approximate amount | Location |
|------|------------------|--------------------|----------|
| a.   | February 10, 2011 | $19,000 | New York City |
| b.   | February 15, 2011 | $30,860 | New York City |
| c.   | February 18, 2011 | $5,000 | New York City |
| d.   | June 20, 2011 | $76,820 | New York City |
| e.   | August 1, 2011 | $932,400 | Mexico City |
| f.   | October 24, 2011 | $400,000 | Houston |

17.    Following each transaction above, IRIZARRY caused DEA personnel to unwittingly wire transfer a portion of the drug proceeds to certain bank accounts that were known only to IRIZARRY and his co-conspirators as controlled by Witness 1. At the same time, Witness 1 gave IRIZARRY and GOMEZ favors, luxury gifts, and personal cash payments. IRIZARRY failed to report to the receipt of these items to the DEA, to the Bankruptcy Court, and to the IRS. For example,

   a.   on or about October 27, 2011, IRIZARRY directed DEA personnel to wire transfer an approximate $55,500 portion of the $400,000 picked up in Houston to a bank account controlled by Witness 1;

   b.   on or about October 27, 2011, Witness 1 gave at least $6,000 to GOMEZ via a personal check that was deposited in a bank account controlled by IRIZARRY and GOMEZ; and

   c.   on or about October 30, 2011, GOMEZ paid $1,500 cash to a car dealership in Miami as a deposit for the purchase of a BMW X5 sport utility vehicle for $66,925.

*Witness 2 pays IRIZARRY and GOMEZ to divert DEA funds*

18.    Between on or about October 17, 2013 and December 4, 2013, an individual known to the Grand Jury and identified herein as Witness 2, arranged for an approximate total of $1,075,000 in drug proceeds to be picked

10

up from drug traffickers in an undercover capacity by IRIZARRY and the DEA. IRIZARRY then caused over half of the funds to be wire transferred from DEA accounts to accounts known only to IRIZARRY as being controlled by Witness 2 or Witness 2's business vendors. Similarly unknown to DEA except IRIZARRY, Witness 2 wire transferred approximately $43,000 to GOMEZ and IRIZARRY during the same period.

*Proceeds used by IRIZARRY and GOMEZ to buy luxury goods*

19.    Beginning in or about October of 2013, IRIZARRY and GOMEZ used the $43,000 from Witness 2, as well as payments from Witness 1 and others, to purchase luxury goods and to pay co-conspirators, including,

a.  on or about December 6, 2013, IRIZARRY purchased a Tiffany diamond ring for approximately $30,000 in cash at a jewelry store in Bal Harbor, Florida. During the transaction IRIZARRY falsely submitted the Social Security number of another person to the jewelry store when he was asked to give his own Social Security number for a government form that the jewelry store was required to file with the IRS and the Financial Crimes Enforcement Network.

b.  on or about December 26, 2013, GOMEZ wire transferred $11,000 to CO-CONSPIRATOR 2 disguised as a commercial transaction by Company 1; and

  c. on or about March 19, 2014, IRIZARRY and GOMEZ bought a
2014 Land Rover sport utility vehicle in part with cash delivered by
GOMEZ, in part with cash delivered by Witness 1, and in part
through a line of credit in GOMEZ's name.

*More payments to IRIZARRY and GOMEZ to divert funds*

  20. On or about October 10, 2014, Witness 1 helped DEA pick up
approximately $120,000 of bulk cash in an undercover capacity from
suspected drug traffickers in Atlantic City, New Jersey. IRIZARRY then
directed DEA personnel to wire transfer an approximate $116,000 portion of
the proceeds to a bank account known only to IRIZARRY as being controlled
by an individual known to the Grand Jury and identified herein as Witness 3.
Unreported to the DEA, the Bankruptcy Court, and the IRS, Witness 3
subsequently paid IRIZARRY the diverted funds by delivering cash to
IRIZARRY in Colombia.

  21. On or about January 12 and January 26, 2015, an individual
known to the Grand Jury and identified herein as Witness 4, helped DEA and
others to pick-up bulk cash totaling approximately 1 million euros from
suspected drug traffickers in the Netherlands, that were then transferred to an
undercover DEA bank account in the Middle District of Florida. From the

Middle District of Florida the majority of the funds were disbursed according to directions from IRIZARRY, including the following:

    a.  on or about January 21, 2015, IRIZARRY caused DEA personnel in Tampa, Florida, to wire transfer a $141,641.05 portion of the currency picked up in the Netherlands to an individual known to the Grand Jury and identified herein as Witness 5;

    b.  on or about January 21, 2015, Witness 5, IRIZARRY and CO-CONSPIRATOR 1 used the $141,641.05 at a Florida car dealership to purchase a 2015 Land Rover for IRIZARRY and CO-CONSPIRATOR 1;

    c.  on or about February 18, 2015, without disclosing CO-CONSPIRATOR 1's involvement, IRIZARRY caused DEA personnel in Tampa, Florida, to wire transfer a $30,000 portion of the currency picked up in the Netherlands to a bank account in Spain on behalf of CO-CONSPIRATOR 1;

    d.  on or about February 19, 2015, IRIZARRY caused DEA personnel in Tampa, Florida to wire transfer a $50,000 portion of the funds to a bank account controlled by an individual known to the Grand Jury and identified herein as Witness 6; and

    e.  on or about February 24, 2015, Witness 6 made a $9,861 payment to

13

a line of credit held by GOMEZ for the aforementioned purchase of a 2014 Land Rover by GOMEZ and IRIZARRY.

22.     On or about February 26 and March 5, 2015, IRIZARRY caused DEA colleagues in Tampa, Florida, to unwittingly file official investigative reports that contained material falsehoods and omissions, and concealed the true nature, location, source, ownership, and control of the drug proceeds picked up in the Netherlands.

*Identity Fraud in Furtherance of the Scheme*

23.     On or about March 19, 2015, IRIZARRY and Witness 1 used the name, passport, Social Security number, and forged signature of an individual known to the Grand Jury and identified herein as Victim 1, to open Criminal Account-1 in the name of Victim 1 without Victim 1's knowledge or consent. As part of the transaction, IRIZARRY's email address was falsely provided to the bank as Victim 1's purported contact information.

24.     Beginning on or about March 27, 2015, Criminal Account-1 was used by the defendants and their co-conspirators to steal money from Victim 1, as well as to conceal the secret diversion of drug proceeds away from DEA undercover money laundering investigations on at least five occasions set forth in transactions 1, 5, 11, 16, and 23 in Exhibit A of this Indictment. The diverted DEA funds were used for personal expenses and business pursuits by

IRIZARRY, GOMEZ, CO-CONSPIRATOR 1, and their co-conspirators. For example,

    a.  as set forth in transactions 2, 3, and 6 through 9 in Exhibit A, IRIZARRY and his co-conspirators used forged checks to transfer an approximate $126,000 portion of diverted funds from Criminal Account-1 to an individual located in the Middle District of Florida known to the Grand Jury and identified herein as Witness 7. Witness 7 then paid these funds to IRIZARRY by delivering cash to an individual in Colombia designated by IRIZARRY; and

    b.  as set forth in transactions 34, 37, 39 through 41, 45, 47, and 49 in Exhibit A, IRIZARRY and his co-conspirators used forged checks to transfer approximately $179,000 from Criminal Account-1 to Witness 3. Witness 3 then paid these funds to IRIZARRY at least in part by depositing cash into a bank account belonging to GOMEZ's mother.

*Unlawful proceeds used by IRIZARRY and GOMEZ to purchase a home*

25.    Beginning in or about January of 2015, IRIZARRY utilized drug proceeds diverted from active DEA investigations, including through Criminal Account-1, to buy himself and GOMEZ a home in Cartagena, Colombia, for approximately $767,000. Witness 1, Witness 3, Witness 7, and others,

delivered cash to Colombia on IRIZARRY and GOMEZ's behalf after receiving funds diverted from DEA investigations in the United States.

*Unlawful proceeds used by CO-CONSPIRATOR 2 to purchase a Lamborghini*

26. On or about March 25, 2016, CO-CONSPIRATOR 2 asked CO-CONSPIRATOR 1 to deliver at least $13,000 to a family member of CO-CONSPIRATOR 2 in Miami. CO-CONSPIRATOR 1 then caused Witness 1 to transfer approximately $13,000 in drug proceeds, including a forged check for $6,800 written from Criminal Account-1, to a criminal associate of CO-CONSPIRATOR 1 known to the Grand Jury and identified herein as Witness 8. Witness 8 subsequently transferred the $13,000 to CO-CONSPIRATOR 2's family member in Miami.

27. On or about April 1, 2016, knowing that the funds were derived from illegal activity, CO-CONSPIRATOR 2 spent the funds as part of a $329,323.84 purchase of a 2017 Lamborghini Huracan Spyder, Vehicle Identification Number ZHWUR1ZF7HLA05916, from a Miami car dealership.

*Unlawful proceeds used by CO-CONSPIRATOR 1 to conduct financial transactions*

28. Beginning on a date unknown, but no later than on or about October 31, 2016, CO-CONSPIRATOR 1 caused other forged checks to be written from Criminal Account-1 and delivered to CO-CONSPIRATOR 1's

family members or associates, including:

|    | Approximate date | Approximate amount | Description |
|----|------------------|--------------------|-------------|
| a. | Oct. 31, 2016    | $5,000             | To family in New York City |
| b. | Nov. 1, 2016     | $4,000             | To family in New York City |
| c. | Dec. 12, 2016    | $5,500             | To family in New York City |
| d. | Apr. 6, 2017     | $3,000             | To family in New York City |
| e. | Jul. 21, 2016    | $5,250             | To a vendor in Doral, Florida |
| f. | Aug. 17, 2016    | $13,800            | To a vendor in Doral, Florida |

*Unlawful proceeds used by IRIZARRY and GOMEZ to purchase vehicle and real property*

29.     On or about June of 2017, IRIZARRY and GOMEZ purchased a 2017 Land Rover sport utility vehicle for $134,582.48. As part of the transaction, IRIZARRY instructed Witness 4 to deliver $7,000 to the Land Rover dealer.

30.     On June 16, 2017, Witness 4 withdrew $6,000 from a bank account traceable to drug transactions and delivered $7,000 cash to the Land Rover dealership on behalf of IRIZARRY and GOMEZ.

31.     In or about December of 2017, IRIZARRY and GOMEZ signed a contract to sell their home in Cartagena, Colombia, and began making payments towards the purchase of a home in Parkland, Florida with the

Cartagena proceeds. As part of the transaction, on or about January 30, 2018, IRIZARRY and GOMEZ caused a wire transfer of $71,000 from an account in Colombia to a bank account in the United States, knowing that the funds were traceable to some unlawful source. IRIZARRY and GOMEZ subsequently caused at least three more wire transfers from Colombia to the United States in support of the Parkland home purchase, including a total of $400,925 traceable to some unlawful source.

32.     On or about August 12, 2019, IRIZARRY and GOMEZ sold their home in Parkland and transferred at least $366,000 of the proceeds to a corporate entity registered in the name of an IRIZARRY family member.

33.     On or about December 18, 2019, IRIZARRY and GOMEZ transferred approximately $286,000 from the corporate bank account of IRIZARRY's family member to a mortgage company in Puerto Rico as payment towards the purchase of real property by IRIZARRY and GOMEZ at 611 Camino Carraizo St., Sabanera Dev., Dorado, Puerto Rico.

All in violation of Title 18, United States Code, Section 1956(h).

### COUNTS TWO THROUGH FIVE
### (Honest Services Wire Fraud – 18 U.S.C. § 1343 and 1346)

34.     All foregoing paragraphs and Exhibit A of this Indictment are hereby re-alleged and incorporated by reference for all purposes.

35.     Beginning in or about February of 2011, and continuing through

a date unknown to the Grand Jury, but no earlier than in or about January of

2018, in the Middle District of Florida, the Southern District of Florida,

Colombia, and elsewhere, the defendant,

JOSE ISMAEL IRIZARRY,

knowingly devised, intended to devise, and participated in a scheme and

artifice to defraud, and to obtain money and property by means of false and

fraudulent pretenses, representations, and promises, and to deprive the Drug

Enforcement Administration and the citizens of the United States of America

of their intangible right to the honest services of IRIZARRY through bribery

and kickbacks. For the purpose of executing and attempting to execute the

scheme and artifice to defraud, and to obtain money and property by means of

false and fraudulent pretenses, representations, and promises, IRIZARRY

knowingly transmitted and caused to be transmitted by means of wire, radio,

and television communication in interstate and foreign commerce the

following writings, signs, signals, pictures, and sounds, each constituting a

separate count:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| Two | Feb. 19, 2015 | Domestic wire transfer of $17,800 from a Bank of America account in Tampa, Florida to a Wells Fargo Bank account in San Francisco, California |
| Three | Feb. 19, 2015 | Domestic wire transfer of $50,000 from a Bank of America account in Tampa, Florida to a Chase Bank account in Doral, Florida |

| Four | Feb. 27, 2015 | Domestic wire transfer of $39,607 from a Bank of America account in Tampa, Florida to a Citibank account in New York, New York |
| Five | Feb. 27, 2015 | Domestic wire transfer of $30,000 from a Bank of America account in Tampa, Florida to a Citibank account in New York, New York |

### Manner and Means of the Scheme

The manner and means by which IRIZARRY sought to accomplish the scheme included,

36.    It was a part of the scheme that IRIZARRY benefited himself corruptly by using his official position as a special agent with the DEA to obtain cash, services, and other things of value, for himself and for GOMEZ and others, from Witnesses 1 through 7, in exchange for agreeing to take official action, and to do and omit to do, acts in violation of his lawful duty, including, among others,

a.  filing false reports of investigation with the DEA;

b.  falsely documenting, and causing DEA agents to falsely document, the nature and the source of wire transfer instructions involved in certain undercover DEA money laundering investigations;

c.  directing drug proceeds picked up during undercover money laundering investigations to be delivered to IRIZARRY's co-conspirators in Count 1 rather than directly to associates of targeted drug trafficking organizations;

20

    d.  concealing his control of Criminal Account-1, a bank account to which he caused DEA colleagues to wire transfer over $200,000 under false and fraudulent pretenses;

    e.  discouraging DEA agents and other law enforcement officers from investigating his co-conspirators in Count 1, as well as Witnesses 1 through 7, and other criminal associates;

    f.  concealing communications between himself and his co-conspirators in Count 1, as well as Witnesses 1 through 7, and other criminal associates, from his DEA colleagues;

    g.  concealing payments to and from his co-conspirators in Count 1, as well as Witnesses 1 through 7, and other criminal associates, from his DEA colleagues; and

    h.  providing sensitive law enforcement information, without authorization, to criminal associates.

37.    It was further a part of the scheme that IRIZARRY and GOMEZ received the following bribes and kickbacks on the following dates,

| | Approximate Date | Approximate Value & Description | Given by |
|---|---|---|---|
| a. | Oct. 27, 2011 | $6,000 check to GOMEZ | Witness 1 |
| b. | Oct.-Nov. 2013 | $43,000 total wire transfers to GOMEZ | Witness 2 |
| c. | Mar. 2014 | $2,500 cash payment to car dealer in Florida | Witness 1 |

21

| d. | Jan. 13, 2015 | $41,000 cash payments to holder of IRIZARRY real estate debt | Witness 7 |
|----|---------------|------------------------------------------------|-----------|
| e. | Jan. 14, 2015 | $41,000 cash payments to holder of IRIZARRY real estate debt | Witness 7 |
| f. | Jan. 21, 2015 | Use of a $141,641 vehicle | Witness 5 and CO-CONSPIRATOR 1 |
| g. | Feb. 24, 2015 | $9,861 payment to line of credit held by GOMEZ | Witness 6 |
| h. | Feb. 27-Mar. 2, 2015 | $64,000 cash payments to holder of IRIZARRY real estate debt | Witness 3 |
| i. | Mar. 9, 2015 | $20,000 cash payments to GOMEZ's mother | Witness 1 |
| j. | Mar. 24-25 2015 | $22,000 cash payments to GOMEZ's mother | Witness 3 |
| k. | Jun. 4-10, 2015 | $47,000 cash payments to holder of IRIZARRY real estate debt | Witness 3 |
| l. | Aug. 14, 2015 | $1,000 cash payment to GOMEZ | Witness 3 |
| m. | Sometime in 2015 | Television valued at $2700 gifted to IRIZARRY | Witness 2 |
| n. | Throughout 2015 | Renovations to IRIZARRY and GOMEZ family home, including labor and materials | Witness 1 |
| o. | Throughout 2015 | Rent-free living accommodations for friend of IRIZARRY | Witness 7 |
| p. | June 16, 2017 | $7,000 payment to car dealer in Florida | Witness 4 |

All in violation of Title 18, United States Code, Sections 1343, 1346, and 2.

## COUNT SIX
### (Conspiracy to Commit Bank Fraud – 18 U.S.C. § 1349)

38.     All foregoing paragraphs and Exhibit A of this Indictment are hereby re-alleged and incorporated by reference for all purposes.

39.     Beginning on a date unknown to the Grand Jury, but no later

than in or about March of 2015, and continuing until a date unknown to the Grand Jury, but no earlier than in or about June of 2017, in the Middle District of Florida, the Southern District of Florida, the Republic of Colombia, the Kingdom of Spain, and elsewhere, the defendant,

JOSE ISMAEL IRIZARRY,

did attempt and conspire with persons known and unknown to the Grand Jury, to commit bank fraud; that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a financial institution; and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of false and fraudulent pretenses, representations and promises, in violation of 18 U.S.C. § 1344.

**Manner and Means**

The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included, among others,

40.    It was a part of the conspiracy that IRIZARRY and the conspirators stole the identity of Victim-1 and opened Criminal Account-1 in Victim 1's name on or about March 19, 2015.

41.    It was further a part of the conspiracy that IRIZARRY and the conspirators used an email account controlled by IRIZARRY to monitor and

23

utilize Criminal Account-1.

42.     It was further a part of the conspiracy that on or about the dates set forth in transactions 1 through 63 in Exhibit A, without Victim 1's knowledge or consent, IRIZARRY and the conspirators deposited and withdrew the amounts set forth in transactions 1 through 63 in Exhibit A, by the methods set forth therein, including funds known to the conspirators to be proceeds of illegal drug trafficking.

43.     It was further a part of the conspiracy that on or about March 23, 2015, without Victim 1's knowledge or consent, IRIZARRY and the conspirators deposited a check for $11,235.43 payable to Victim 1. The check included Victim 1's forged signature.

44.     It was further a part of the conspiracy that on or about the dates set forth in transactions 33, 35, 43, and 61 in Exhibit A, the funds were delivered to members of CO-CONSPIRATOR 1's family in the United States via checks written from Criminal Account-1 without Victim 1's knowledge or consent. The checks all included Victim 1's forged signature.

45.     It was further a part of the conspiracy that on or about the dates set forth in transactions 2, 3, and 6 through 9 in Exhibit A, the funds set forth were delivered to the Middle District of Florida and deposited into bank accounts located in the Middle District of Florida.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS SEVEN THROUGH TWELVE
### (Bank Fraud – 18 U.S.C. § 1344)

46.     All foregoing paragraphs and Exhibit A of this Indictment are hereby re-alleged and incorporated by reference.

47.     On the approximate dates set forth in transactions 2, 3, and 6 through 9 in Exhibit A, each transaction constituting a separate and individual count charged herein by the Grand Jury, in the Middle District of Florida and elsewhere, the defendant,

JOSE ISMAEL IRIZARRY,

did obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of false and fraudulent pretenses, representations and promises, when he caused the funds set forth in transactions 2, 3, and 6 through 9 in Exhibit A to be delivered to the Middle District of Florida via forged checks written from Criminal Account-1, without the knowledge or consent of Victim 1, and deposited into bank accounts located in the Middle District of Florida, without the knowledge and consent of Victim 1.

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT THIRTEEN
### (Conspiracy to Commit Aggravated Identity Theft – 18 U.S.C. § 371)

48.     All foregoing paragraphs and Exhibit A of this Indictment are hereby re-alleged and incorporated by reference.

49.     Beginning on an date unknown, but no later than in or about March of 2015, and continuing through and including at least in or around June of 2017, in the Middle District of Florida, the Southern District of Florida, Colombia, and elsewhere, the defendant,

JOSE ISMAEL IRIZARRY,

and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other, to commit an offense against the United States, that is, aggravated identity theft in violation of Title 18, United States Code, Section 1028A; all in violation of Title 18, United States Code, Section 371.

### Manner and Means

The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

50.     It was part of the conspiracy that IRIZARRY, GOMEZ and co-conspirators would and did possess, without lawful authority, means of identification, specifically images of a passport and Social Security card of a person known to the Grand Jury and identified herein as Victim 1.

26

51.     It was further a part of the conspiracy that IRIZARRY would and did transfer images of Victim 1's passport and Social Security number to Witness 1 for the purpose of fraudulently opening a bank account known herein as Criminal Account-1.

52.     It was further a part of the conspiracy that a bribe was paid to an employee of a U.S. financial institution to open Criminal Account-1 without ever meeting Victim 1 in person.

53.     It was further a part of the conspiracy that throughout 2015 and 2016, IRIZARRY and the conspirators arranged for over $200,000 in drug proceeds to be wire transferred into Criminal Account-1.

54.     It was further a part of the conspiracy that throughout 2015 and 2016, IRIZARRY, CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2 caused forged checks to be written from Criminal Account-1 in Victim 1's name, without Victim 1's knowledge or consent.

## OVERT ACTS

55.     In or about early 2015, Witness 5 would and did transfer images of Victim 1's passport and Social Security to IRIZARRY to unlawfully cash a check in the amount of $11,235.43 made out to Victim 1.

56.     On or about March 19, 2015, Witness 1 used Victim 1's passport and Social Security number to fraudulently open Criminal Account-1 in the

United States in the name of Victim 1, without Victim 1's knowledge or consent. As part of the account opening process, IRIZARRY's email account was falsely provided to the bank as Victim 1's contact information.

57.     Beginning on or about March 19, 2015, IRIZARRY and the co-conspirators accessed and monitored Criminal Account-1, without Victim 1's knowledge or consent, by logging in to a bank website posing as Victim 1.

58.     On or about March 23, 2015, Witness 1 deposited Victim 1's check for $11,235.43 into Criminal Account-1 and withdrew $10,000 without Victim 1's knowledge or consent.

59.     On a date unknown, but no earlier than March 23, 2015, Witness 1 provided $10,000 to Witness 5.

60.     In or about early 2015, IRIZARRY and his co-conspirators caused approximately $126,000 in drug proceeds to be withdrawn from Criminal Account-1 and delivered to Witness 7 in the Middle District of Florida.

61.     On or about the dates set forth in transactions 1 through 63 in Exhibit A, each transaction being a separate overt act, the defendants and their co-conspirators deposited and withdrew the amounts set forth in transactions 1 through 63 in Exhibit A, by the methods set forth therein, all without Victim 1's knowledge or consent.

All in violation of Title 18, United States Code, Sections 371 and 1028A.

## COUNTS FOURTEEN THROUGH NINETEEN
### (Aggravated Identity Theft – 18 U.S.C. § 1028A)

62.     All foregoing paragraphs and Exhibit A of this Indictment are hereby re-alleged and incorporated by reference.

63.     On the approximate dates set forth in transactions 2, 3, and 6 through 9 in Exhibit A, each transaction constituting a separate and individual count charged herein by the Grand Jury, in the Middle District of Florida, the Southern District of Florida, Colombia, and elsewhere, the defendant,

JOSE ISMAEL IRIZARRY,

did knowingly possess and use, without lawful authority, a means of identification of another person, that is, the name, Social Security number, passport, and forged signature, during and in relation to a felony enumerated in Title 18, United States Code, Section 1028A, that is, theft or embezzlement of public money, in violation of Title 18, United States Code, Section 641, as well as bank, wire fraud, and conspiracy, in violation of Title 18, United States Code, Sections 1343, 1344, and 1349, as charged in Counts 3 through 12.

All in violation of Title 18, United States Code, Sections 1028A and 2.

## FORFEITURE

64.     All foregoing paragraphs and Exhibit A of this Indictment are

hereby re-alleged and incorporated by reference for the purpose of alleging

forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(1).

    65.    From their engagement in any or all of the violations alleged in

Counts 1 through 18, the defendants,

JOSE ISMAEL IRIZARRY, and
NATHALIA GOMEZ-IRIZARRY,

and others known and unknown to the Grand Jury, shall forfeit to the United

States of America, pursuant to 18 U.S.C. § 982(a)(1), any property, real or

personal, involved in such offense and any property traceable to such property.

    66.    The assets to be forfeited specifically include, but are not limited

to, a judgment in the amount that was involved in the offense, as well as:

    (a)    One 2017 Lamborghini Huracan Spyder, Vehicle Identification Number ZHWUR1ZF7HLA05916; and

    (b)    One Tiffany diamond ring purchased on about December 6, 2013, and referenced in paragraph 20 of this Indictment; and

    (c)    All real property and associated rights related to 611 Camino Carraizo St., Sabanera Dev., Dorado, Puerto Rico 00646, also known as parcel 037-056-369-59, origin 037-000-008-69, located at 611 Urb Sabanera Camino de Carraizo in Dorado, Puerto Rico.

If any forfeitable assets, including but not limited to those described

above, as a result of any act or omission of the defendants:

    (a)    cannot be located upon the exercise of due diligence;

30

(b)    has been transferred or sold to, or deposited with, a third person;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. §853(p), as incorporated by 18 U.S.C. § 982(b)(1).

Dated:

A TRUE BILL,

_Mary K-Kiernan_
Foreperson

DEBORAH L. CONNOR
Chief, MLARS
U.S. Department of Justice

By: _____
Joseph Palazzo
MLARS Trial Attorney

BYUNG J. PAK
United States Attorney
Northern District of Georgia

By: _____
Kurt Erskine
First Assistant United States Attorney

31

EXHIBIT A:

Criminal Account-1 transactions by the conspirators

|  | APPROX. DATE | DEPOSIT | WITHDRAWAL | PAYEE / PAYOR | TRANSACTION DESCRIPTION |
|---|---|---|---|---|---|
| 1. | 03/27/15 | $48,500.00 | | DEA Undercover Bank Account Known to the Grand Jury | Domestic Wire In |
| 2. | 04/10/15 | | $20,000.00 | Witness 7 | Check Paid |
| 3. | 04/13/15 | | $20,000.00 | Witness 7 | Check Paid |
| 4. | 04/15/15 | | $10,000.00 | Cash | Check Paid |
| 5. | 05/12/15 | $55,000.00 | | DEA Undercover Bank Account Known to the Grand Jury | Domestic Wire In |
| 6. | 05/14/15 | | $20,000.00 | Witness 7 | Check Paid |
| 7. | 05/14/15 | | $34,000.00 | Witness 7 | Check Paid |
| 8. | 05/18/15 | | $17,000.00 | Witness 7 | Check Paid |
| 9. | 05/18/15 | | $15,000.00 | Witness 7 | Check Paid |
| 10. | 03/02/16 | | $3,000.00 | Witness known to the Grand Jury | Check Paid |
| 11. | 03/09/16 | $44,343.00 | | DEA Undercover Bank Account known to the Grand Jury | Domestic Wire In |
| 12. | 03/11/16 | | $10,000.00 | Witness known to the Grand Jury | Check Paid |
| 13. | 03/11/16 | | $13,499.00 | Witness known to the Grand Jury | Check Paid |
| 14. | 03/11/16 | | $20,388.00 | Witness known to the Grand Jury | Check Paid |
| 15. | 03/28/16 | | $6,800.00 | Witness 8 | Check Paid |
| 16. | 04/15/16 | $35,500.00 | | DEA Undercover Bank Account Known to the Grand Jury | Wire In |
| 17. | 04/18/16 | | $18,900.00 | Witness known to the Grand Jury | Check Paid |
| 18. | 04/21/16 | | $5,500.00 | Witness known to the Grand Jury | Check Paid |
| 19. | 04/22/16 | | $6,000.00 | Witness known to the Grand Jury | Check Paid |
| 20. | 07/21/16 | | $5,250.00 | Vehicle Dealer known to the Grand Jury | Check Paid |
| 21. | 08/01/16 | | $1,000.00 | Witness known to the Grand Jury | Check Paid |

| | APPROX. DATE | DEPOSIT | WITHDRAWAL | PAYEE / PAYOR | TRANSACTION DESCRIPTION |
|---|---|---|---|---|---|
| 22. | 08/17/16 | | $13,800.00 | Vehicle Dealer known to the Grand Jury | Check Paid |
| 23. | 08/23/16 | $23,200.00 | | DEA Undercover Bank Account Known to the Grand Jury | Domestic Wire In |
| 24. | 08/25/16 | | $11,500.00 | Witness known to the Grand Jury | Check Paid |
| 25. | 08/26/16 | | $8,500.00 | Witness known to the Grand Jury | Check Paid |
| 26. | 09/06/16 | | $3,500.00 | Cash | Check Paid |
| 27. | 09/13/16 | | $9,118.40 | Witness known to the Grand Jury | Check Paid |
| 28. | 09/14/16 | | $200.00 | Witness known to the Grand Jury | Check Paid |
| 29. | 09/14/16 | | $1,881.60 | Witness known to the Grand Jury | Check Paid |
| 30. | 10/21/16 | | $10,800.00 | Witness known to the Grand Jury | Check Paid |
| 31. | 10/24/16 | | $9,200.00 | Witness known to the Grand Jury | Check Paid |
| 32. | 10/24/16 | | $1,300.00 | Witness known to the Grand Jury | Check Paid |
| 33. | 10/31/16 | | $5,000.00 | CO-CONSPIRATOR 1 family member known to the Grand Jury | Check Paid |
| 34. | 10/31/16 | | $2,010.00 | Witness 3 | Check Paid |
| 35. | 11/01/16 | | $4,000.00 | CO-CONSPIRATOR 1 family member known to the Grand Jury | Check Paid |
| 36. | 11/03/16 | | $16,000.00 | Witness known to the Grand Jury | Check Paid |
| 37. | 11/14/16 | | $30,800.00 | Witness 3 | Check Paid |
| 38. | 11/15/16 | | $1,000.00 | Witness known to the Grand Jury | Check Paid |
| 39. | 11/18/16 | | $10,650.00 | Witness 3 | Check Paid |
| 40. | 11/25/16 | | $16,950.00 | Witness 3 | Check Paid |
| 41. | 12/05/16 | | $21,655.00 | Witness 3 | Check Paid |
| 42. | 12/06/16 | | $2,500.00 | Witness known to the Grand Jury | Check Paid |
| 43. | 12/12/16 | | $5,500.00 | CO-CONSPIRATOR 1 family member known to the Grand Jury | Check Paid |
| 44. | 12/13/16 | | $70.00 | Cash | Check Paid |
| 45. | 12/19/16 | | $34,700.00 | Witness 3 | Check Paid |

|  | APPROX. DATE | DEPOSIT | WITHDRAWAL | PAYEE / PAYOR | TRANSACTION DESCRIPTION |
|---|---|---|---|---|---|
| 46. | 12/23/16 | | $2,000.00 | Witness known to the Grand Jury | Check Paid |
| 47. | 12/23/16 | | $39,610.00 | Witness 3 | Check Paid |
| 48. | 01/09/17 | | $150.00 | Witness known to the Grand Jury | Check Paid |
| 49. | 01/18/17 | | $23,000.00 | Witness 3 | Check Paid |
| 50. | 01/27/17 | | $6,900.00 | Witness known to the Grand Jury | Check Paid |
| 51. | 01/30/17 | | $3,100.00 | Witness known to the Grand Jury | Check Paid |
| 52. | 02/01/17 | | $8,000.00 | Witness known to the Grand Jury | Check Paid |
| 53. | 02/01/17 | | $7,000.00 | Witness known to the Grand Jury | Check Paid |
| 54. | 02/02/17 | | $1,500.00 | Witness known to the Grand Jury | Check Paid |
| 55. | 02/03/17 | | $3,900.00 | Witness known to the Grand Jury | Check Paid |
| 56. | 02/08/17 | | $7,000.00 | Witness known to the Grand Jury | Check Paid |
| 57. | 02/08/17 | | $8,000.00 | Witness known to the Grand Jury | Check Paid |
| 58. | 02/10/17 | | $10,000.00 | Witness known to the Grand Jury | Check Paid |
| 59. | 02/24/17 | | $850.00 | Witness known to the Grand Jury | Check Paid |
| 60. | 03/31/17 | | $200.00 | Witness known to the Grand Jury | Check Paid |
| 61. | 04/06/17 | | $3,000.00 | CO-CONSPIRATOR 1 family member known to the Grand Jury | Check Paid |
| 62. | 05/04/17 | $81,990.00 | | DEA Undercover Account Known to the Grand Jury | Domestic Wire In |
| 63. | 06/05/17 | | $81,990.00 | DEA Undercover Account Known to the Grand Jury | Domestic Wire Out |

No.

# UNITED STATES DISTRICT COURT
Middle District of Florida
Tampa Division

THE UNITED STATES OF AMERICA

vs.

JOSE ISMAEL IRIZARRY, and
NATHALIA GOMEZ-IRIZARRY

## INDICTMENT

Violations:   18 U.S.C. §§ 1956, 1343, 1344, 1346, 1349, 1028A, 371, and 981-982

A true bill,

_Mary K. Kiernan_
Foreperson

Filed in open court this 19th day

of February 2020.

_____
Clerk

Bail $_____

GPO 863 525